DAVID LANDRUM, Oregon State Bar ID Number 955425
Senior Deputy City Attorney
David.Landrum@portlandoregon.gov
ROBERT YAMACHIKA, Oregon State Bar ID Number 065560
Deputy City Attorney
Rob.Yamachika@portlandoregon.gov
Office of City Attorney
1221 SW 4th Avenue, Rm 430
Portland, OR 97204
Telephone: (503) 823-4047
Facsimile: (503) 823-3089
Of Attorneys for Defendants

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **ELIZABETH EVON NICHOLS,** | Case No.  3:12-cv-1889-MO |
| **PLAINTIFF,** | |
| v. | **DEFENDANTS' AMENDED WITNESS LIST** |
| **CITY OF PORTLAND, JEFFREY MCDANIEL AND DORIS PAISLEY,** | |
| **DEFENDANTS.** | |

In accordance with the Trial Management Order entered December 5, 2012, defendants respectfully submit their witness list and statements.

Defendants may call all or some of the following witnesses to testify at trial.

1.     **Laurie Nemes.**  Branch Manager, Chase Bank.  15 minutes for direct testimony.

Ms. Nemes was the Branch Manager of the Chase Bank branch at 811 SW 6th Avenue in Portland, Oregon on November 17, 2011.  The main entrance is on SW Yamhill Street to the west of the intersection with SW 6th Avenue, through a door that opens from the street to an ATM lobby, which has a door into the main lobby of the bank.  On November 17, 2011, Ms.

Page 1 –   DEFENDANTS' AMENDED WITNESS LIST

Nemes called 9-1-1 to report that demonstrators had entered the ATM lobby of the bank, as well as the bank lobby itself. Ms. Nemes will authenticate her voice on an audio recording of that 9-1- call. Ms. Nemes reported that demonstrators had entered the bank's ATM lobby and the main bank lobby and refused to leave. Ms. Nemes asked that police officers be dispatched to remove demonstrators from the bank lobby. Ms. Nemes interacted with Portland Police Bureau ("PPB") Detective Anderson with respect to what the bank wanted to happen and what the police could do. Ms. Nemes told Detective Anderson that the bank wanted the demonstrators removed, and if they refused to leave, the bank would provide authority for the police to arrest demonstrators that refused to leave.

Ms. Nemes will testify to any other matter put at issue by plaintiff.

2.    **Robert Day.** Central Precinct Police Commander. One (1) hour for direct testimony.

Cmdr. Day was the designated Incident Commander for downtown demonstrations on November 17, 2011. Cmdr. Day directed that RRT Squads be deployed along the south sidewalk of SW Yamhill Street between SW 6th Avenue and SW Broadway on that date to support the arrest team inside Chase Bank, who were dealing with demonstrators who refused to leave the inside of the bank. Cmdr. Day stood at the corner of 6th and Yamhill, and communicated with RRT Cmdr. Elmore face-to-face. The bank entrance on the south sidewalk of SW Yamhill Street west of SW 6th Avenue had to be secured to stop more demonstrators from entering the ATM and bank lobbies, and because the crowd blocked that door so that arrestees inside could not be taken out through that door. Cmdr. Day's intent in clearing the entire sidewalk was to create distance between the crowd and officers in order to minimize the potential for interference with the arrests inside the bank and to clear 6th and Yamhill Streets to allow traffic, especially public transportation, to move freely. Cmdr. Day decided to clear the south sidewalk on SW Yamhill Street and Yamhill Street itself in order to address the arrestees in the bank. The mission for

Page 2 –    DEFENDANTS' AMENDED WITNESS LIST

RRT Officers outside Chase Bank on November 17, 2011 was to clear the south sidewalk along SW Yamhill Street and SW Yamhill Street itself in order to facilitate the processing of the arrestees inside Chase Bank. PPB practice is for RRT to perform the clearing function; the RRT Commander (Lt. Elmore) organizes and directs the RRT Squads on how to proceed to carry out that mission after direction from the Incident Commander to do so.

Commander Day will testify to any other matter put at issue by plaintiff.

3.    **Michael Marshman.** Police Lieutenant. 30 minutes for direct testimony.

Lt. Marshman has been employed as a sworn officer by PPB since 1991, and as a Lieutenant since 2009. He is currently assigned as Adjutant for the Chief of Police. Lt. Marshman's regular assignment as of November 17, 2011 was Day Shift Lieutenant for Central Precinct. On that date, Central Precinct Cmdr. Bob Day was assigned as Incident Commander for protest demonstrations in downtown Portland, and Lt. Marshman was assigned as Assistant Incident Commander, as was Captain Bryan Parman. Captain Parman was responsible for reporting to Cmdr. Day regarding protest demonstration activities taking place outdoors and responding to Cmdr. Day's instructions. Lt. Marshman was responsible for reporting to Cmdr. Day regarding protest demonstration activities taking place inside downtown buildings and responding to Cmdr. Day's instructions. Lt. Marshman responded to the 911 call from Chase Bank, along with PPB Sgt. David Anderson. Lt. Marshman will authenticate audio recordings of PPB radio traffic regarding the police action at Chase Bank.

At Chase Bank, demonstrators had entered the ATM lobby through the doors on the south side of SW Yamhill Street, and the bank lobby beyond the ATM lobby. Lt. Marshman entered the bank lobby from a door located on SW 6th Avenue between SW Yamhill Street and SW Taylor. When Lt. Marshman and Det. Anderson arrived, they found that the bank had locked the doors that led from the ATM lobby into the bank lobby, but were unable to lock the

Page 3 –    DEFENDANTS' AMENDED WITNESS LIST

doors that led from the ATM lobby to SW Yamhill Street. Lt. Marshman determined that the doors from SW Yamhill Street into the ATM lobby had to be secured in order to prevent more demonstrators from entering and to allow demonstrators who were willing to leave voluntarily to exit the building. Demonstrators crowded the sidewalk on the south side of SW Yamhill Street, and SW Yamhill Street itself, immediately outside the doors to Chase Bank. Lt. Marshman advised Cmdr. Day that RRT Squads, Mounted Patrol and Mobile Field Force Officers would be necessary to clear the sidewalk outside the doors to Chase Bank. Cmdr. Day gave directions for those resources.

Lt. Marshman's initial plan for removing arrestees from inside Chase Bank was to bring a vehicle on SW Yamhill Street near the bank doors and bring arrestees outside to transport them to a place for arrest processing. In Lt. Marshman's opinion, the size, conduct and his perception of the demeanor of the crowd on the south sidewalk of SW Yamhill Street, in SW Yamhill Street itself, and on the MAX platform on the southeast edge of Pioneer Courthouse Square caused him to decide to find an alternate route. Lt. Marshman was concerned that bringing arrestees out in view of the large, apparently hostile crowd could create a "flashpoint" for further, unnecessary conflict.

The arrest team completed necessary preliminary arrest processing of the arrestees in the bank and ATM lobbies. That included at least two people arrested outside the bank on the south sidewalk of SW Yamhill Street. Lt. Marshman learned later that one of those two people was Plaintiff Nichols. Then all of the arrestees and the arrest team, including Det. Anderson and Lt. Marshman, exited Chase Bank by the route the arrest team had entered the bank. A vehicle was staged on SW 6th Avenue, and arrestees were transported in that vehicle to SE Precinct for further arrest processing.

It is Lt. Marshman's professional opinion, based on his training and experience. That the crowd on the south sidewalk of SW Yamhill Street and in SW Yamhill Street outside the Chase

Page 4 –    DEFENDANTS' AMENDED WITNESS LIST

Bank doors presented a potential danger to officers and arrestees because 1) until the sidewalk was cleared, they could possibly enter the ATM lobby; 2) they could potentially interfere with the work of the arrest team; and 3) they could interfere with the safe movement of arrestees to the custody vehicle. Lt. Marshman believed that the space of the empty sidewalk and street between officers, arrestees and bank facility on one side and demonstrators exercising their First Amendment rights in Pioneer Courthouse Square across SW Yamhill Street to the north, gave necessary protection from crowd conduct becoming violent and thereby necessitating an escalated use of police force.

Lt. Marshman will testify to any other matter put at issue by plaintiff.

**4.    David Anderson.**  Retired Police Sergeant assigned to Detective Division. 30 minutes for direct testimony.

This witness has been deposed. It is anticipated Det. Anderson will testify consistently with his deposition testimony. David Anderson is currently retired from the PPB. At his retirement at the end of June 2013, Anderson was a Detective Sergeant in charge of the Burglary Unit. Det. Anderson held that position for 6 years prior to his retirement, and was employed as a sworn Officer by PPB for 28 years. Sgt. Anderson was deposed on March 26, 2013 and will testify consistent with his prior testimony.

On November 17, 2011, the PPB Detective Division Burglary Unit Detective Sergeants, including Det. Anderson, were operating the Mass Field Arrest Team. The Mass Field Arrest Team attends to the administrative details of a subject taken into custody, after the initial arrest and before booking at the jail. Det. Anderson and his squad were sent to Chase Bank on the basis of a 911 call reporting that people had taken over the ATM lobby between the street and the bank lobby. Det. Anderson found about 30 demonstrators in that area upon his arrival.

Det. Anderson and his squad entered Chase Bank through a service entrance on SW 6th Avenue, then a series of hallways. They entered from there because the crowd outside the doors

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
(503) 823-4047

on SW Yamhill Street appeared hostile, and the officers wanted to attract as little attention as possible. Once inside, Det. Anderson talked to the bank manager about whether the bank wanted the people who refused to leave arrested for trespass, and learned that is what the bank wanted. Then Det. Anderson went to the glass doors between the bank lobby and the ATM lobby and tried to make contact with the people inside the ATM lobby. The people were not cooperative at first; Det. Anderson went and talked to the bank manager again briefly, then wrote a message out with a marker on paper asking if someone was in charge. A man volunteered to act as the leader, and Det. Anderson wrote another message asking if the people wanted to be arrested. The crowd responded affirmatively, and Det. Anderson let them know arrest could be arranged. Then Det. Anderson got a phone number from the volunteer leader and communicated by phone. In an effort to decrease the size of the group to be arrested, Det. Anderson advised the group in the ATM lobby that because they were damaging the lobby to some extent, the arrests would be for burglary, which was a felony. Upon being so advised, approximately half of the people in the ATM lobby voluntarily exited to avoid arrest. Fifteen remained and submitted to arrest voluntarily. None were charged with burglary.

The people inside the bank who volunteered to be arrested were taken into custody with no significant problems. Then each arrestee was walked to a place in the bank lobby, one-at-a-time, until the ATM lobby was cleared. Then Plaintiff Nichols was brought to Det. Anderson by two PPB Officers, including PPB Officer Matt Bigoni. That was Det. Anderson's first contact with Plaintiff Nichols. Det. Anderson understood that Plaintiff Nichols had been arrested outside the bank, and was being brought in to the arrest team because it was convenient and safe. It was plain to Det. Anderson that Plaintiff Nichols had been pepper sprayed based on his own experience and her red eyes, crying, in some pain, red face, and mucus running from her nose. Det. Anderson observed that Plaintiff Nichols was having a hard time talking, although she was commenting to Anderson, but Anderson does not recall what Nichols was saying.

Page 6 –   DEFENDANTS' AMENDED WITNESS LIST

Det. Anderson knew from experience that the discomfort of a person who has been pepper sprayed can be mitigated by washing the spray from the person's face. That is part of the PPB training. Det. Anderson obtained a bottle of water from somebody inside the bank and told Plaintiff Nichols "Hey, this doesn't make any sense, but open your eyes, it will hurt more instantly but just trust me." Det. Anderson walked Nichols outside onto the sidewalk, then poured water into Plaintiff Nichols' eyes, over her nose and over her mouth. After using up that bottle, Det. Anderson obtained a second bottle of water from the same source and continued flushing Plaintiff Nichols' face. Det. Anderson then obtained a towel and wiped off Plaintiff Nichols' face. The whole process took a period of minutes. The effects of the pepper spray on Plaintiff Nichols diminished substantially. Detective Anderson then took Nichols back inside the bank. Nichols remained in handcuffs or flex cuffs the whole time. Det. Anderson perceived Nichols' tone and demeanor as angry and uncomfortable, based on Nichols' verbalization, but not combative.

After paperwork was completed for all of the arrestees inside the bank, they were taken out of the bank through the same door the arrest team had entered and transported elsewhere.

Det. Anderson will testify to any other matter put at issue by plaintiff.

**5.    DeVinci (Vince) Elmore.** Police Lieutenant. 30 minutes for direct testimony.

Lt. Elmore testified in a perpetuation deposition on June, 24, 2013 and the videotape of his testimony will be played for the jury. Lt. Elmore has been employed in a sworn capacity by PPB since 1990, and has held the rank of Lieutenant since 2008. Lt. Elmore is assigned as the Commander of the RRT. Lt. Elmore has been assigned to RRT since its inception in PPB in 2000. Lt. Elmore started with RRT as a "Squad Leader" in the rank of Sergeant, and has been assigned as the Detached Commander of the RRT since approximately November 2011. "Detached Commander" means that RRT is not Lt. Elmore's only assignment – he is also assigned as a Patrol Lieutenant in East Precinct. On November 17, 2011, Lt. Elmore was

Page 7 –    DEFENDANTS' AMENDED WITNESS LIST

Operations Lieutenant for RRT, and was present for the events at issue at the intersection of SW Yamhill and SW 6th Avenue.

The purpose of RRT within PPB is crowd management and crowd control. In instances of large outdoor gatherings, RRT is deployed to manage, facilitate and coordinate public assemblies before and during the event. RRT coordinates, manages and facilitates both permitted and unplanned, spontaneous events.

The PPB Assistant Chief of the Operations Division has final authority over RRT. RRT is directly overseen by a Commander – the position currently held by Lt. Elmore. Lt. Elmore works with a subordinate Officer, the Lieutenant for Operations, as well as a First Sergeant. That team of three makes decisions and gives direction to RRT Squad Leaders and Officers on the scene at events. PPB's RRT consists of four (4) Squads (Alpha, Bravo, Charlie and Delta). Each Squad consists of 12-15 members, overseen by a Squad Leader and an Assistant Squad Leader. Typically, directives are given to the Squad Leaders or Assistant Squad Leaders by the Operations Lieutenant, and are passed to the Squad members.

RRT is called out to events by an Incident Commander. Those callouts may be known and planned for in advance, or may happen spontaneously. The Incident Commander is typically the Precinct Commander in the Precinct where the event takes place. On November 17, 2011 the Incident Commander for protest demonstration events in downtown Portland was Central Precinct Cmdr. Bob Day.

On November 17, 2011, PPB had intelligence that indicated plans by demonstrators to occupy bank lobbies. RRT Squads were deployed to multiple downtown locations to provide support to PPB units assigned to the inside of the bank lobbies and carry out the directions of the Incident Commander. Lt. Elmore was assigned as the liaison officer for PPB's RRT and similar units from outside police agencies, including Multnomah County Sherriff's Office (MCSO) and Oregon State Police (OSP). When called for by the Incident Commander that day (Central

Page 8 –   DEFENDANTS' AMENDED WITNESS LIST

Precinct Cmdr. Robert Day), Lt. Elmore took PPB RRT Bravo and Delta Squads, as well as units from the OSP and MCSO to the corner of SW Yamhill and SW Sixth Avenue to support the PPB Mounted Patrol Unit and Mobile Field Force Units ("MFF"). The mission of the RRT Squads was to support an MFF arrest unit inside the Chase Bank. That unit was making arrests of demonstrators inside the bank. The RRT Squads under Lt. Elmore's supervision were assigned to clear the sidewalk on the south side of SW Yamhill Street between SW Broadway and SW Sixth Avenue. The sidewalk needed to be cleared of people in order to prevent more demonstrators from entering the bank lobby through its main doors and provide a clear space to move the arrestees from the inside of the bank to a vehicle for transport to a processing area. The Mounted Patrol units on that sidewalk also needed to be reinforced based on the capacity of the horses and the size and demeanor of the crowd.

Lt. Elmore directed PPB RRT Bravo and Delta Squads to clear the sidewalk on the south side of SW Yamhill Street between SW Broadway and SW Sixth Avenue at the direction of the Incident Commander. PPB RRT Officers are trained, and were directed on that day, to direct the people on the sidewalk to move to the north, toward Pioneer Courthouse Square. The people on the sidewalk were also advised to move to the east along the south side of SW Yamhill Street.

Some, but not all, PPB RRT Officers carry OC or pepper spray among their tools. PPB Patrol Officers also carry similar containers of OC spray. PPB Directive 1040.00, "Aerosol Restraints," governs the use of OC spray by PPB Patrol Officers and RRT Squad Officers in individual application by the officer to an individual subject. [*Lt. Elmore will be shown PPB Directive 1040.00 as an exhibit and be asked to comment on it*]. OC spray comes in larger containers that can deliver a larger volume of spray to multiple subjects simultaneously. RRT Squad Officers are not authorized by any PPB Policy or practice to apply OC spray to multiple persons in a crowd control situation, sometimes referred to as "broadcast" spray, except where specifically ordered by the Incident Commander. [*Lt. Elmore will be shown PPB 11/17/2011*

Page 9 –    DEFENDANTS' AMENDED WITNESS LIST

*Incident Action Plan as an Exhibit and be asked to comment on it*].  PPB has no policy or practice that authorizes the use of OC spray in response to the content of speech by any subject, or the side taken by any demonstrator.  PPB RRT Squad Officers and supervisors are specifically trained that the content of speech cannot be the catalyst for any action taken with respect to any subject.

RRT is a specialized unit constituted and trained for the specific purpose of crowd management and crowd control in large, public outdoor gatherings, both planned and spontaneous.  PPB RRT does not facilitate, condone or permit its Squad Officers to take individual action outside the coordinated team action of the RRT Squad.  In that context, the use of OC Spray against an individual subject can be an on-scene decision by the Squad Leader or Assistant Squad Leader, according to the criteria contained in PPB Directive 1040.00 "Aerosol Restraints" and RRT training.

Lt. Elmore will testify to any other matter put at issue by plaintiff.

6.    **John Young.**  Police Officer.  30 minutes for direct testimony.

This witness has been deposed.  It is anticipated Officer Young will testify consistently with his deposition testimony.  John Young is a PPB Officer, and has been so employed since approximately April 2006 – a period of 7 years.  Officer Young testified in a perpetuation deposition on June, 24, 2013 and the videotape of his testimony will be played for the jury. Officer Young has been assigned to the RRT for approximately 3-4 years.  RRT Officers do not receive any special pay for that duty, they are paid for the hours they work at their regular rate. RRT duty is no different from working patrol or anything else.  Officer Young is regularly assigned as a Patrol Officer in East Precinct, and works RRT when RRT is called out and at scheduled RRT training.  Officer Young's understanding of the purpose of RRT is that it is used for crowd management and crowd control in protest demonstrations.  RRT training consists of training related to skirmish lines, squad movement, "platoon movement type of stuff."  Officer

Page 10 –  DEFENDANTS' AMENDED WITNESS LIST

Young understands "skirmish lines" to refer to when RRT officers move together in a line, with batons held out in front of us with both hands, moving a crowd by pushing them using the baton.

Officer Young understands RRT to be organized into 4 squads – Officer Young is assigned to Bravo Squad. There are approximately 12-13 members of Bravo Squad. Bravo Squad is supervised by a Squad Leader, Sgt. Roeser, and an Assistant Squad Leader, Sgt. McDaniel. The Squad Leader and Assistant Squad Leader give directions to the Squad members, and the Squad members follow those directions.

Officer Young has been trained in his employment with PPB in the use of pepper spray. Officer Young carries pepper spray in his duties as a patrol Officer, and in his duties with RRT. Officer Young was carrying pepper spray on November 17, 2011, the same small size canister he carries when on patrol duty. "It's very small."

In Officer Young's understanding, the PPB rules that govern his use of pepper spray in the patrol context and in the RRT context are the same. In an RRT situation, the Incident Commander can authorize the use of pepper spray on more than one person at a time, that's called "broadcast spray." Officer Young will explain that the difference between "broadcast spray" and non broadcast spray is essentially that "directed" use would be specifically at one person engaged in physical resistance. The individual officer has to decide about using that in a given situation. "Broadcast spray" would be if you were spraying a crowd or walking up and down a line and spraying people. The Incident Commander has to authorize that.

Officer Young's understanding of the PPB rules that govern an officer's use of pepper spray is that it is appropriately used when a person engages in physical resistance, or displays an intent to engage in physical resistance. Officer Young's basis for that understanding is PPB Directive 1040.00. [*Officer Young will be shown PPB Directive 1040.00 "Aerosol Restraints" as an exhibit and asked to comment on it*]. In Officer Young's understanding, an individual

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
(503) 823-4047

Officer in an RRT situation can be authorized to use pepper spray without a specific authorization by the Incident Commander.

On November 17, 2011, Officer Young was working an RRT assignment, wearing a helmet with the number B-12 on the back. The B is for Bravo Squad, that's how officers know who is in each squad when wearing body armor and helmets. Officer Young was assigned to the Portland Police's RRT Bravo Squad that day. On November 17, 2011, Officer Young used force against demonstrators outside the Chase Bank on SW Yamhill Street between SW 6th Avenue and SW Broadway by moving people using his baton. Officer Young gave the people a warning before using his baton to move them by telling people near him in the crowd that when they were told to move, that they needed to move or the RRT Officers were going to move them. Bravo Squad had been deployed to other places besides the south sidewalk of SW Yamhill Street outside the Chase Bank on November 17, 2011. Officer Young's understanding of what his RRT squad was to do on the south sidewalk of SW Yamhill Street outside the Chase Bank on November 17, 2011 was to clear the sidewalk in front of Chase Bank. Officer Young did not have a clear understanding at the time about why that was Bravo Squad's assignment. Officer Young was told there were demonstrators in the bank, but didn't see them. Officer Young got the instruction to clear the sidewalk directly from Sgt. McDaniel – "he came up to me and said 'Clear the sidewalk.'"

Officer Young gave directions to people in the crowd based on Sgt. McDaniel's instruction. There were people directly in front of Officer Young. Officer Young asked them twice to move and then pointed to the east. Officer Young hoped that by asking them, the situation might resolve itself. "I made more of a statement like 'we're getting ready to move. You guys are going to have to move.' But they chose not to." When Bravo Squad started to move the people in the crowd, they didn't move. Officer Young used his baton to push them back. The crowd started to push back against the RRT Officers. Bravo Squad was able to push

Page 12 – DEFENDANTS' AMENDED WITNESS LIST

the crowd to the sidewalk on SW 6th Avenue. In the Bravo Squad skirmish line, Officer Young was on the border of the street and sidewalk. Officer Young pushed some into the street in the general effort to move them to the east. In Officer Young's observation, the crowd continued to move back into the RRT skirmish line RRT officers pushed them to the east, toward SW 6th Avenue. Mounted Patrol Unit Officers, the officers on horses, got between the crowd and the RRT skirmish line to create space.

Officer Young observed Plaintiff when she was arrested, but didn't know her name at the time. Officer Young observed Plaintiff being pepper sprayed and pulled through the skirmish line out of the corner of his eye. Officer Young recalls that he was standing in the street, off the curb at that time. In the course of moving to the east, RRT Officers had encountered a tree, newspaper boxes and a big metal traffic signal box, all of which had broken up the RRT skirmish line. Officer Young was behind the rest of the skirmish line. Plaintiff was to Officer Young's right. Officer Young's attention was not focused on Plaintiff, he had a view of the crowd in front of him and could see Plaintiff, Officer Paisley's back, and because Officer Paisley is short, see over Paisley's head. Officer Young saw Plaintiff stepping in towards Officer Paisley. That stood out to Officer Young; the whole crowd was aggressive, but Ms. Nichols appeared on the more aggressive side at that moment.

Officer Young saw Plaintiff get pepper sprayed, and then briefly after she was pepper sprayed; in Officer Young's observation, Plaintiff was pulled through the RRT skirmish line, then Officer Young did not see her after that. Officer Young started over to try and help with Plaintiff, but others were already doing that, so he focused back on the crowd in front of the RRT skirmish line.

Officer Young will testify to any other matter put at issue by plaintiff.

7.    **John R. Black.** One (1) hour for direct testimony.

This witness has been deposed. It is anticipated Mr. Black will testify consistently with

Page 13 –   DEFENDANTS' AMENDED WITNESS LIST

his deposition testimony. John R. Black is an expert witness. Mr. Black is employed as a Washington County Sheriff's Deputy in Hillsboro, Oregon and currently holds the rank of Lieutenant and the position of Investigations Lieutenant for Washington County Investigations Division. Counsel for Defendants provided an expert witness statement for Mr. Black to Plaintiff's counsel on April 17, 2013. Mr. Black was deposed on May 24, 2013. Mr. Black will testify consistently with his expert statement and deposition transcript. Mr. Black's essential opinion is that Officer Paisley's and Sgt. McDaniel's actions were consistent with the standards and training for an appropriate use of physical force as dictated by the situation and in response to Ms. Nichols' actions or apparent willful non-actions.

Mr. Black will testify that the concepts of crowd management and crowd control as related to protests, civil disturbances, and the like are concepts routinely trained within police agencies. Mr. Black will testify about police agencies' training and methods of response to such events. Mr. Black will testify about how police agencies are routinely trained to respect the civil liberties and rights of individuals in such events, but also to balance those interests against governmental interest when individuals and their actions become unlawful and police officers must act to fulfill their lawful duties. Mr. Black will testify that special situations such as crowd control/civil disturbances may be considered somewhat unique in that in addition to equipping and training the individual officers with the ability to respond and protect themselves or others they may be expected to equip and train specialized response elements with additional tools and techniques for the same purpose. Some of these tools include such things as a riot or straight baton, OC spray, and less lethal munitions and their delivery systems. Mr. Black will testify about training in such tools as the riot or straight baton including its methods of carry, its utilization as a striking implement, target areas and its potential for injury, its utilization as a movement tool, and how the officer might counter protesters or threats attempting to take the baton from them. Mr. Black will also testify about training in such tools as OC spray to include

Page 14 – DEFENDANTS' AMENDED WITNESS LIST

its effects and potential for injury, target areas, and aftercare and that in all cases, training would also include when it would be appropriate to use the differing and proportionate levels of force against potential threats.

Mr. Black will testify about the evolution of police practices and operational response to civil protests, marches and rallies. This will include testimony on the common practice of special teams made up of police officers that have received additional training in tactics dealing with crowds or civil unrest known as rapid response teams ("RRT") and how they may be used by police agencies in dealing with such situations. Mr. Black will testify about tactics and procedures of RRTs and that in order for these teams to be effective and accomplish their mission or assignments within an operation, they should attempt to maintain their integrity of their team, formations, and tactics at all times. He will discuss that the failure to maintain the integrity of a skirmish line, a wedge moving forward, or similar crowd control tactic by allowing the formations to be breached, spread out beyond a manageable distance, or encircled creates a highly dangerous environment for the police officers and, in turn, those they are trying to protect.

Mr. Black will testify about Officer Paisley's use of her riot baton against Plaintiff and testify that Officers involved in crowd control are trained that when a person moves forward towards them that this conduct more often than not is an intentional act. Additionally, especially in volatile crowd situations, police officers are trained that a person moving towards them is potentially dangerous. A protestor aggressing towards officers on the skirmish line may represent an attempt at taking away a baton, attacking or breaking the integrity of the line, or a personal attack against the individual officer. Officers are trained to respond quickly, proportionally, and decisively to such aggressive actions as a means to protect themselves as well as the integrity of the line. Officers are trained that should they perceive such an aggressive action responding with a jab from the on-guard position might be appropriate.

Page 15 –   DEFENDANTS' AMENDED WITNESS LIST

Additionally, Mr. Black is expected to testify that Sgt. McDaniel's actions were based in ensuring that a *deminimus* level of force was used against Ms. Nichols while at the same time ensuring the safety of the other officers and ensuring their ability to perform their lawful actions. As trained in the concept of defensive tactics and specifically in the use of OC spray the momentary burst was proportionate as measured against the response it was meant to accomplish.

Police officers are trained to use OC spray in short directed bursts aimed at the upper chest and face area so that the OC spray is the most effective. OC spray works by causing the eyes to shut, creating a burning sensation/pain, and forcing the person sprayed to concentrate more on the effects of the spray then their original actions such as attacking another person. Sgt. McDaniel's placement of the short OC spray shot was consistent with that of a reasonably well trained officer. The OC spray affected only the target or person it was aimed at and was of a duration only long enough needed to accomplish its purpose. Mr. Black will testify that officers are trained to render aftercare when OC is used whenever feasible and it is safe to do so and that after plaintiff was brought through the line and during her processing aftercare was given by Sgt. Anderson as related to OC spray.

Mr. Black will testify that the actions that led to the use of Officer Paisley's baton and Sgt. McDaniel's use of OC spray were first predicated by Ms. Nichol's actions and choices. The use of physical force by a peace officer may be considered appropriate and consistent with their training when seen as a proportionate and balanced response when comparing the need for control and the potential of a threat to cause physical harm. Additionally, this case is examined with the added factors and considerations of the potential flash points/explosiveness of mob dynamics and their ability to cause harm to officers. Mr. Black will testify that in this case, the force applied was appropriate in choice of technique, proportionate and consistent with training of a reasonably well trained peace officer.

Page 16 –  DEFENDANTS' AMENDED WITNESS LIST

Mr. Black will testify to any other matter put at issue by plaintiff.

8.    **Matthew Bigoni**. Police Officer. 15 minutes for direct testimony.

This witness has been deposed. It is anticipated Officer Bigoni will testify consistently with his deposition testimony. Matthew Bigoni is a PPB Officer and has been so employed since approximately March 2010. Officer Bigoni was deposed on March 26, 2013 and will testify consistent with his prior testimony. Officer Bigoni was part of the Mobile Field Force ("MFF") deployed on November 17, 2011 as a supplement to the RRT. Officer Bigoni will testify that MFF members typically wear regular everyday patrol uniforms, Kevlar helmets and carry a PR-24 baton and wear less protective gear than RRT members. Officer Bigoni will testify that MFF will stand behind RRT who are on the front line in crowd control situations. MFF supplement RRT by being available to take people into custody that are pulled through RRT's skirmish line so that RRT officers can continue to focus on crowd control, while MFF can take control of an arrestee from a safe position.

Officer Bigoni will testify that the Chase Bank on SW 6th and Yamhill was surrounded by people and that orders were given to the Portland Mounted Patrol to go in and move people away from the bank and RRT would follow and also move people from that portion of the sidewalk. Officer Bigoni will testify that the protesters seemed upset and were yelling, cursing, flipping them off, and throwing things. Officer Bigoni will testify that the first time he recalls seeing plaintiff was when she was handed off to MFF through the RRT line. Officer Bigoni will testify that the crowd was a "riot" as defined by ORS 166.015. Officer Bigoni will testify that the sound truck was giving commands repeatedly to clear the street and that the street was open to vehicular traffic. In addition, he will testify that RRT officers, in their efforts to push people back, were pointing and telling people to get back, and moving forward towards people, which would indicate that they wanted them to go in the opposite direction.

Page 17 –  DEFENDANTS' AMENDED WITNESS LIST

Officer Bigoni will testify that when Ms. Nichols was brought through the line, two other MFF officers, Ted Wilson and Andrew Hearst, held onto her and he put flex cuffs on Ms. Nichols. After placing flex cuff on Ms. Nichols, Office Bigoni walked her directly into the Chase Bank where there were other PPB members waiting to process people in custody. Officer Bigoni will testify that Ms. Nichols was complaining that she was pepper sprayed and that her eyes hurt. Officer Bigoni couldn't tell that Ms. Nichols had been pepper sprayed and he did not see a lot of tears and snot from Ms. Nichols. Officer Bigoni will testify that Ms. Nichols was designated with the number 82 and delivered to Sgt. Anderson. Sgt. Anderson then gave aftercare to Ms. Nichols by pouring water on her face for her. Office Bigoni will testify that he did not provide aftercare because he did not have any water to do so.

Officer Bigoni will testify to any other matter put at issue by plaintiff.

9.    **Darren Posey.** Police Detective. 30 minutes for direct testimony.

This witness has been deposed. It is anticipated Det. Posey will testify consistently with his deposition testimony. Officer Darren Posey has been a PPB Detective since 2006 and has been employed by PPB as an Officer since 1997. Det. Posey was deposed on April 8, 2013 and will testify consistent with his prior testimony.

Det. Posey was assigned to the RRT on November 17, 2011 and has been assigned to the RRT since 2006. Det. Posey will testify that typically RRT officers will have a broad two day training where they will go over marching and formation skills and the use of force. Training will include some practice with batons and different scenarios that RRT could face in crowd control situations, report writing and arrest procedures.

Det. Posey will testify that the straight riot baton is a RRT officer's main defense system and is used to protect RRT officers from thrown objects and is a way to use limited amounts of force when moving someone, as well as effecting an arrest where it may have to be used to strike someone when being assaulted or attacked. Det. Posey will testify about the port arms position

Page 18 – DEFENDANTS' AMENDED WITNESS LIST

and how that position can create a barrier between the RRT officer and another person thereby keeping them at bay. Det. Posey will also testify about the on guard position where the baton is used to jab or strike someone by thrusting the stick out and hit them, targeting the area of the body at the belt line. Det. Posey will testify that a jab is used when a person is at an aggressive physical resistance level, and has taken a posture they are attempting to assault the officer or attempting to grab an officer's baton. Det. Posey will testify that there is a potential for injury, such as bruising, pain or a broken rib, associated with the use of a baton jab. Det. Posey will testify that officers don't target baton strikes in particular areas like the head or spine, instead targeting the belt line or legs depending on the circumstances.

Det. Posey will testify that he did not employ any jabs with his baton on November 17, 2011, only pushes. He does recall seeing other officers using jabs, one instance was when a person had hit a Mounted Patrol Unit member's horse and someone then reached towards the horse possibly trying to grab a hold of the reins or do something to the officer.

Det. Posey will testify that the use of pepper spray is different in RRT training from other types of training. Det. Posey will testify that incident command oversees the use of pepper spray by RRT against a group of people in crowd control who are committing a criminal offense. Additionally, RRT line officers don't typically have ready access to pepper spray because their hands are full with other things. Typically a supervisor or line backer, a person who is behind the line, can watch and read the crowd that is taking place and apply pepper spray as they need to at that point. This is different compared to an officer, where you're dealing with a subject who is resisting arrest or some kind of fight takes place. Det. Posey will testify that pepper spray is used by RRT when someone is physically resisting or posturing in an aggressive manner to assault an officer. There is a difference between using pepper spray on a group or an individual. Det. Posey will testify that for pepper spray use on a group that is something that is designated by the

Page 19 –  DEFENDANTS' AMENDED WITNESS LIST

incident commander.  Use of pepper spray on an individual requires that person to be engaged in physical resistance and/or the attempt at physical resistance.

Det. Posey will testify that there is a difference between pepper spray and a baton in that pepper spay is a chemical agent and causes pain, but once the chemical is washed off, the pain is over.  Whereas with a baton strike it can leave bruises and can cause a broken bone or injury to an organ which would require a longer recovery time.  Det. Posey will testify that the term physical resistance is a number of things, it can be the posture of the person who is going to physically resist.  For example, if you're trying to arrest someone and they ball up their fists, clench their jaw, take a fighting stance to prevent you from taking them into custody.  Physical resistance can be from pulling away or pushing.  Physical resistance can come in more passive forms of pushing back, holding their ground, preventing you from doing your job.  Det. Posey will testify that passive resistance is when a person who is being taken into custody instead of putting their hands behind their back, they go limp and lie on the ground and won't do anything. Det. Posey will testify that in a crowd control situation, if a person is not moving back when being told to do so, that would be a form of passive resistance.

Det. Posey will testify that RRT officers are trained about people's right to gather together and engage in free speech and that there is a balance that has to be struck between those rights and the rights of others for free travel and access to areas.  Det. Posey will testify that RRT officers work towards providing places and opportunities for people to engage in free speech and that if RRT needs to deny access to a particular public location for a temporary period that they are trained to direct people to a place where they can go or point out to a location if feasible for them to go so that the can continue to exercise their rights.  Det. Posey will testify that he would not give a person a warning before they were pepper sprayed, because there may not be time to do so or they may be engaged in a particular action that does not allow it.  A warning need not be given.

Page 20 –  DEFENDANTS' AMENDED WITNESS LIST

Det. Posey will testify a that prior to moving to the 6th and Yamhill location, the information he had was that there were other officers conducting an arrest in a bank and that RRT needed to provide support because there were a lot of protestors and people that were inhibiting that arrest or potentially inhibiting that arrest. When Det. Posey arrived at the bank, there were a lot of people in front of the bank and the Mounted Patrol Unit had moved in ahead of RRT to move people. Det. Posey will testify that people were on both the sidewalk and in the street when he arrived with his RRT squad. Det. Posey will testify that when he arrived at the scene the crowd was chanting and agitated. The crowd was yelling, which included obscenities, but he did not hear threats. In addition, when he first arrived the crowd was not throwing things, but later a substance, like water, urine or soda pop was thrown in RRT's direction. Det. Posey will testify that it seemed like there were people in the crowd that wanted to pick a fight with officers, based on the behavior of people trying to push at officers, get up close and get in the way, pointing fingers at them.

Det. Posey will testify that he personally gave warnings or instructions for people to move back, saying you need to move, you need to move down to the intersection down the sidewalk. Det. Posey will testify that Plaintiff was part of the group of people that he was telling they needed move down the street, down the sidewalk.

Det. Posey will testify that other officers were giving instructions to move as well. Det. Posey will testify that the sound truck was telling people that the street was being opened to vehicular traffic and that they needed to vacate the street. With regard to whether he perceived confusion among the crowd about orders to move down the sidewalk and to move out of the street, Det. Posey will testify, yes and no. There were people saying they were on the sidewalk already, but that he had the impression that when they were told to move down the sidewalk, they wanted to argue about being in the street and being in the sidewalk as opposed to just going down the sidewalk. Det. Posey's impression was that it wasn't legitimate confusion but a basis

Page 21 – DEFENDANTS' AMENDED WITNESS LIST

to argue.  Det. Posey will testify that Plaintiff was in the group of people he and other officers
directed to move.

Det. Posey will testify that he pushed Plaintiff two or three times because she refused to
move.  Det. Posey remembers one push specifically:  Plaintiff was up next to a steel stanchion,
some kind of control box, and she had planted herself right there and did not move.  The way she
planted herself there, she was attempting not to be moved.  Det. Posey shouted at her to move,
and he thought there was clear indication by that point, that the direction was for people to move
to the end of the street.  It was very clear that RRT Officers were moving down to the end of the
street.  Det. Posey will testify that he had to use his body weight (being careful so he didn't have
to jab with his baton) to make Plaintiff physically move past the box obstacle.  Det. Posey
describes Plaintiff's resistance when she stood against the metal box as passive-type resistance -
she didn't push him, she is just not moving.

Det. Posey will testify that he did not see Plaintiff link arms with other people, but did
see Plaintiff try to grab Officer Paisley's baton.  Det. Posey will testify that as RRT had been
pushing people back, Plaintiff was facing them along with other people and shouting and Officer
Paisley is pushing back and the crowd is working together, creating a blockade, pushing back.
Det. Posey will testify that Plaintiff was pushed back and she bends backwards and then Officer
Paisley releases the push and Plaintiff reaches out and tries to grab the baton, at which point
Plaintiff gets pushed again.  Det. Posey doesn't recall if Plaintiff took another swing, but he
remembers that one swipe at the baton.  Det. Posey will testify that Plaintiff was reaching out to
grab the baton and then she was hit by a very short burst of pepper spray.

Det. Posey will testify that he recalls from the video that Plaintiff pulled her bandana
down and started yelling, but he doesn't remember what she said.  Det. Posey will testify that
Officer Paisley was immediately to his right and that Det. Posey was wearing helmet number
"B11."  Det. Posey will testify that when Plaintiff took a swipe at Officer Paisley's baton,

Page 22 –  DEFENDANTS' AMENDED WITNESS LIST

Plaintiff was an arms length or less away.  Plaintiff "kind of" moved forward, but Det. Posey can't say if she took a step or not.  At this point Det. Posey was somewhat watching Plaintiff, but there were a lot of people in from of him, but Plaintiff's reaching out to grab Officer Paisley's baton drew his attention to her.

Det. Posey will testify that Plaintiff was posturing in an aggressive manner in that she was yelling at Officer Paisley and Plaintiff reached out and took a swipe at Officer Paisley or her baton.  Plaintiff was angry and upset and had become aggressive.  Det. Posey will testify that when Plaintiff is pushed back, Officer Paisley's baton, comes upward, because Plaintiff is arching back and so it looked like the baton kind of came up towards Plaintiff's neck area during the push.  Det. Posey will testify that officers don't train to push at people's neck and try to avoid that area.  After that push Officer Paisley pulled her baton back and then Plaintiff tried to grab the baton, Officer Paisley may have pushed her again just before Plaintiff was pepper sprayed.

Det. Posey will testify that he saw Plaintiff get pepper sprayed in the face with a very short burst of pepper spray, and that Plaintiff fell down.  Det. Posey just saw Plaintiff fall down and lost sight of her and did not see what happed to her on the ground at the time because his responsibility was to focus on the crowd.  Det. Posey will testify that at the time Plaintiff was pepper sprayed, it is debatable whether Plaintiff was engaged in aggressive physical resistance; she took a swipe at Officer Paisley to grab her baton, she was lunging out to take hold of the baton, which would be an aggressive behavior.  Det. Posey will testify that the use of pepper spray on Plaintiff eliminated the potential of an injury from a baton jab by Officer Paisley or another RRT officer because had Plaintiff not been pepper sprayed, another officer may have done something to prevent Plaintiff from moving forward and doing something further to Officer Paisley.  Det. Posey will testify that the rules that govern the use of pepper spray for RRT officers on an individual subject are not any different from the rules that govern an officer in a patrol context.

Page 23 –   DEFENDANTS' AMENDED WITNESS LIST

Det. Posey will testify to any other matter put at issue by plaintiff.

**10.    Erik Kammerer.** Police Detective. 30 minutes for direct testimony.

This witness has been deposed. It is anticipated Det. Kammerer will testify consistently with his deposition testimony. Erik Kammerer is a PPB Detective and has had that rank since 2003 and has been employed with PPB since 1994. Det. Kammerer was deposed on April 9, 2013 and will testify consistent with his prior testimony. Det. Kammerer will testify that he was standing slightly behind and off to the right of Sgt. McDaniel and saw Plaintiff get pepper sprayed. Det. Kammerer was assigned to RRT Delta Squad as a linebacker and a less lethal operator on November 17, 2011. Det. Kammerer will testify that as a linebacker he is a "go between" the two squad sergeants. The sergeants will relay orders to the two linebackers, who relay those orders to their half of the squad. Det. Kammerer will testify that his squad, Delta Squad, was down the line of police that was stretching from the south sidewalk of Yamhill and that he ended up next to Bravo Squad for a time because the rate at which the crowd was pushing varied. Det. Kammerer was later able to rejoin his squad.

Det. Kammerer will testify that MFF units had responded to a 911 call from Chase Bank about protesters being there. RRT squads were sent in to facilitate MFF being able to remove the people in custody out of the bank.

Det. Kammerer will testify that his position as a linebacker, which is not directly on the line, gives him the luxury of being able to look deeper into the crowd than right in front of him. From that position Det. Kammerer can look for people that are maybe five or six deep, which provides them some anonymity to their actions preparing to engage the police whether it be by throwing objects or other things. Det. Kammerer will testify that he was carrying an FN303, which is a "souped up paint ball gun" that fires a fin stabilized impact munition that contains a pink marking component. Det. Kammerer did not fire his FN303 on November 17, 2011. Det. Kammerer has received special training in the use of the FN303 weapon platform. Det.

Page 24 –  DEFENDANTS' AMENDED WITNESS LIST

Kammerer will testify that because RRT line officers are directly on the line and carrying their riot baton in two hands, they are not able to retrieve their pepper spray, so it's generally left up to the sergeants to engage one-on-one with anybody that needs to be pepper sprayed. Det. Kammerer will testify that the criteria for use of pepper spray is that officers are allowed to engage one person with pepper spray for one specific action and not everybody around them. There was no order given for broadcast spray of aerosol restraints by the incident commander on November 17, 2011.

Det. Kammerer will testify that sergeants carry the larger pepper spray cans and that as a linebacker he has the FN303 which is a two-handed weapon, so he doesn't have an extra hand for pepper spray. The criteria to use his FN303 is a greater threshold than pepper spray. Aggressive physical resistance is the threshold required to engage someone with his FN303. On November 17, 2011 he observed Plaintiff engaged in aggressive physical resistance, but he did not use his FN303 because he didn't have to because of Sgt. McDaniel's actions. Det. Kammerer will describe Plaintiff as involved in aggressive physical resistance because, when he saw her, she had been pushed back by Officer Paisley and plaintiff jumped forward, appeared to have been pushed back again, and again came back towards Officer Paisley, this time reaching out towards her. Det. Kammerer will testify "There are only two reasons that you're going to do that: one is you're going to try and take Officer Paisley's stick or you're going to assault Officer Paisley. Either of those is aggressive physical resistance and that meets the criteria" to use his FN303. Det. Kammerer will testify that he was preparing to use his FN303, by clearing his line of sight, preparing to take the safety off, preparing to raise the weapon and discern his aim points. But all that became unnecessary when Sgt. McDaniel applied his pepper spray. Detective Kammerer will testify that after Sgt. McDaniel used the pepper spray on Plaintiff he told Sgt. McDaniel it was a great shot. It was a great shot because it was a perfect placement. It only hit Plaintiff and didn't hit anyone else, it immediately stopped her, prevented him from

Page 25 – DEFENDANTS' AMENDED WITNESS LIST

having to inflict possible injury to her with his FN303. Det. Kammerer was extremely relieved

when Sgt. McDaniel used the pepper spray because he was afraid Plaintiff might be injured by

himself using his FN 303. When a target is closer than ten feet, he is trained to target extremities

such as arms and legs to maintain the less lethality of the FN303. He was working on

establishing his line of sight towards Plaintiff when all of his actions became unnecessary.

Det. Kammerer describes the crowd of 15 or 20 people in front of him as yelling,

shouting, shoving, refusing to move back, refusing to obey commands to exit the street to go to

the sidewalk. Detective Kammerer will testify that he heard warnings being given by the police

to the crowd surrounding Plaintiff just prior to being pepper sprayed. The warnings that he heard

being given were move back, go to the sidewalk, go into the square, leave the street, move. The

source of these warnings was from a sound truck that was continuously broadcasting, as well as

officers on the line, sergeants, linebackers – members of RRT verbally giving those commands.

Det. Kammerer will testify that RRT was trying to move the crowd away from the front of the

bank. The sidewalk on the south side of Yamhill was closed. The crowd could move into the

north side of Yamhill, which also gave the crowd access to Pioneer Square. The crowd could

have moved onto the west side of 6th Avenue, the east side of 6th Avenue, both north and south of

Yamhill. The crowd just could not be on the sidewalk in front of the bank or in the intersection –

they had to clear the sidewalk all the way to the corner of 6th and Yamhill. Det. Kammerer will

testify that when his squad arrived in front of the bank, once the orders to move were given and

the people refused to clear the area and stand there, there was probable cause to arrest that group

of 30 or 40 people. He has no idea if Plaintiff was part of that group of people.

Det. Kammerer will testify that Plaintiff was pulled through the RRT line after she was

pepper sprayed and that he assisted in picking her up and handing her off to other officers. Det.

Kammerer used one hand to help pick up Plaintiff, but did not see her pulled through the line,

nor was he involved in placing flex cuffs on her. Det. Kammerer will testify that he was worried

Page 26 –  DEFENDANTS' AMENDED WITNESS LIST

that Plaintiff would be injured prior to being pepper sprayed and that he was also concerned about Plaintiff inflicting injury upon Officer Paisley.

Det. Kammerer will testify to any other matter put at issue by plaintiff.

**11.    Doris Paisley**. Police Officer. One (1) hour for direct testimony.

This witness has been deposed. It is anticipated Officer Paisley will testify consistently with her deposition testimony. Doris Paisley is a named defendant. Paisley is a PPB Officer currently assigned to East Precinct. Officer Paisley was deposed on March 28, 2013 and will testify consistent with her prior testimony. Paisley was employed by the Molalla Police Department as an administrative assistant from 1988 to 1993, including two years as a reserve officer from 1991 to 1993. Paisley has been employed as an Officer by the PPB since February 1994.

Officer Paisley is also assigned to the PPB RRT, and has served on RRT since approximately 2010. Officer Paisley has been assigned to RRT Bravo Squad during her entire assignment to RRT. Sgt. McDaniel has been Bravo Squad leader during Officer Paisley's experience. Sgt. Roeser is the other Bravo Squad Sergeant, but Officer Paisley has no recollection of Sgt. Roeser being present during the events involving plaintiff on November 17, 2011.

RRT training is a minimum of 40 hours at the beginning. It concentrates on hand signals, moving in formation, maintaining skirmish lines, creating columns of one and two officers, and working with horses in the Mounted Patrol Units. There are no pay incentives for serving in RRT.

Officer Paisley is 5'3" tall and approximately 170 lbs.; those were Officer Paisley's height and weight on November 17, 2011. Officer Paisley characterizes herself as shorter and smaller than the majority of other RRT Officers.

RRT Officers are trained to use a long baton, which they refer to as a "stick." That type if baton is only used in RRT applications. The long batons are effective in maintaining a

Page 27 –   DEFENDANTS' AMENDED WITNESS LIST

skirmish line because of their length and their utility for pushing crowd members who will not move voluntarily. RRT Officers are trained in how to carry it, how to move crowds with it, how to maintain certain stances using it. The long baton can be used in a sideways port-arms position to push people, or in an on-guard position to jab at a person with the end of the baton. If the crowd moves voluntarily, no need arises to use the baton to move them; if the crowd does not move when directed to do so, the baton is used to cause the crowd to move. RRT Officers are trained that it can be an appropriate use of force to swing the long batons to strike people in some circumstances. When pushing a person from the port-arms position, the long baton is held at the chest level of the officer and the crowd, and used to push the crowd members in the midsection, between the waist and shoulders.

Officer Paisley has used a long baton to move crowd members in an RRT call-out approximately a dozen times. Officer Paisley is not aware of an instance where she has injured a subject with the long baton in an RRT call-out.

On November 17, 2011, Officer Paisley understood the mission of RRT Bravo Squad outside Chase Bank on SW Yamhill Street was to clear the front of the bank so that PPB Officers inside that had already taken people into custody had a route to take those arrestees out of the bank, free of protesters that were banging on the windows and causing more disturbance. Officer Paisley understood that from the radio or directly from Sgt. McDaniel. Officer Paisley was wearing helmet "B9" on November 17, 2011.

Officer Paisley and other RRT Officers outside the Chase Bank on November 17, 2011 gave directions to the crowd that included "Move," "go over to the square," "move back," "clear the sidewalk," "move over to Pioneer Square," pointing over to Pioneer Courthouse Square, "back," "move off the sidewalk," all given continuously as the RRT skirmish line advanced. Officer Paisley was not personally aware of a predetermined escape route for demonstrators from the south sidewalk adjacent to SW Yamhill Street outside Chase Bank on November 27, 2011, it

Page 28 – DEFENDANTS' AMENDED WITNESS LIST

was evident to Officer Paisley that people were already leaving the sidewalk towards Pioneer Square to the north. Officer Paisley, and other RRT Officers at the scene, attempted to de-escalate the situation by telling people to move, move over to the square, to move back, without having to utilize any force.

Officer Paisley understands "passive resistance" to include persons who go limp and fail to comply with verbal commands with no other overt signs of resistance.

Upon first arriving on the south sidewalk of SW Yamhill Street with RRT Bravo Squad, Officer Paisley observed two media people pinned inside their van by demonstrators surrounding the van. Then after RRT Officers arrived on the sidewalk, demonstrators moved sufficiently to allow the two people to exit the van. Officer Paisley and others directed the two to go over to Pioneer Courthouse Square, which they did. Plaintiff was immediately next to the two people when the direction was given and the people moved to the north. As Mounted Patrol Unit horses moved to the east on the south sidewalk of SW Yamhill Street, Officer Paisley observed Plaintiff to Paisley's left. Officer Paisley and others gave directions to move, but Plaintiff dug in her heels and held her ground. Officer Paisley observed Plaintiff to dig in her heels and resist being moved, to move in toward Paisley prior to the time Paisley pushed Plaintiff with a baton. Officer Paisley observed Plaintiff to have multiple opportunities to move over to Pioneer Courthouse Square before Paisley pushed Plaintiff with a baton. Officer Paisley observed Plaintiff to be moved by another RRT Officer with his shoulder before Paisley pushed Plaintiff with a baton.

Officer Paisley used her baton in the on-guard position to jab a white male in a black jacket who was behind the skirmish line and attempting to hold his ground. That man grabbed the end of Officer Paisley's baton with both hands, and Paisley pulled her baton in an upwards movement to get it away from the man's grasp, consistent with her training. As Officer Paisley brought her baton down from that position, Plaintiff was in front of Paisley. As Paisley lowered the baton, Paisley pushed Plaintiff back with the baton. The RRT skirmish line was advancing,

Page 29 –  DEFENDANTS' AMENDED WITNESS LIST

Plaintiff was attempting to hold her ground; as Paisley re-integrated herself into the skirmish line after dealing with the man in the black jacket, Paisley's baton was vertical when she encountered Plaintiff.  Before Plaintiff was able to be face-to-face with Paisley, Paisley pushed Plaintiff with a baton, Plaintiff arched her back and Paisley's baton moved up Plaintiff's midsection and contacted Plaintiff under the chin, but in Paisley's observation, did not contact Plaintiff's throat or windpipe.  Paisley believes the contact between her baton and Plaintiff's chin was accidental, Paisley did not intend it.  At that time, Paisley observed a man behind Plaintiff in a grey cap who appeared to attempt to pull Plaintiff back from the RRT skirmish line.  Paisley then observed Plaintiff's hands and fingers to be outstretched.  Paisley did not know whether Plaintiff was reaching for her or Paisley's baton, but Paisley observed Plaintiff making an aggressive move toward Paisley that appeared intended for one of those things.  Plaintiff came at Paisley with Plaintiff's hands outstretched.  Officer Paisley observed Plaintiff to be angrily yelling at Paisley when Plaintiff approached Paisley for a second time.  Officer Paisley then observed a stream of pepper spray come from behind Paisley and into Plaintiff's face.

Plaintiff turned her back to the RRT skirmish line and sat down on the pavement.  At that time Officer Paisley did not know who had used pepper spray on Plaintiff.  Officer Paisley pulled Plaintiff behind the RRT skirmish line after Plaintiff was pepper sprayed so Plaintiff would not be trampled by RRT Officers, because Plaintiff had sat down on the sidewalk in front of the RRT skirmish line.

Officer Paisley arrested Plaintiff and not other demonstrators because Plaintiff failed to obey a lawful order.  But at the time Paisley pulled Plaintiff behind the RRT skirmish line, Paisley's intention was to keep Plaintiff safe because Paisley assumed Plaintiff was somewhat blinded by the pepper spray and not in a position to care for herself under the circumstances.  Officer Paisley had a handful of Plaintiff's hair when Paisley pulled Plaintiff behind the RRT skirmish line because Plaintiff's hair lay over the collar of Plaintiff's leather jacket, Plaintiff had

Page 30 –  DEFENDANTS' AMENDED WITNESS LIST

turned away and dropped to the ground with her back to Paisley, so the collar of Plaintiff's coat was the only way Paisley had to take hold of Plaintiff and bring Plaintiff away from the skirmish line.

At no time outside the Chase Bank on November 17, 2011 did Officer Paisley give, or hear given, an order to the crowd to disperse. Instead, Officer Paisley understood the directions given to her, and the direction she and other RRT Officers gave to the crowd outside the Chase Bank on November 17, 2011, to be to move from the south sidewalk on SW Yamhill Street to Pioneer Courthouse Square to the north, or across SW 6th Avenue to the east, and clear SW Yamhill Street and the south sidewalk of SW Yamhill Street west of SW 6th Avenue.

Officer Paisley will testify to any other matter put at issue by plaintiff.

12.     **Jeffrey McDaniel.**  Police Sergeant.  One (1) hour for direct testimony.

This witness has been deposed.  It is anticipated Sgt. McDaniel will testify consistently with his deposition testimony.  Jeffrey McDaniel has been employed as a sworn officer by the PPB since March 2001, and has held the rank of Sergeant since July 2011.  Prior to being hired by PPB, Sgt. McDaniel served as a reserve officer for the Seaside Police Department, and as an intern prior to achieving reserve officer status.

Sgt. McDaniel is currently assigned as a Sgt. in North Precinct.  Sgt McDaniel has been assigned to the PPB RRT since December 2010, before achieving the rank of Sgt.  Sgt. McDaniel's RRT assignment is a "detached" assignment, meaning that he only works RRT missions when RRT is called out, or for RRT training.  Sgt. McDaniel serves as assistant squad leader for RRT Bravo Squad; he is a supervisor of RRT Bravo Squad Officers in that capacity. Sgt. McDaniel is assistant squad leader for RRT Bravo Squad, Sgt. Daren Roeser is RRT Bravo Squad leader.  Sgt. McDaniel serves as squad leader when Sgt. Roeser is absent.  RRT squad leaders are generally positioned behind the skirmish line formed by RRT Officers, where they receive instructions from the incident command structure, evaluate the crowd, and evaluate

Page 31 –  DEFENDANTS' AMENDED WITNESS LIST

allocation of RRT resources in the specific incident. If a gap appears in the RRT squad's skirmish line, the squad leaders can step in to fill that gap until more resources become available.

RRT Officers are paid their regular wage for hours worked in an RRT assignment, there is no special pay or benefit incentive. RRT's general purpose is crowd control and crowd management. Crowd management consists essentially of following a crowd from a distance in case circumstances create a need for police intervention. Crowd control consists of response to a crowd situation that becomes violent and/or destructive, and people in the crowd have to be directed where they can and cannot go. The decision to transition from crowd management to crowd control is generally made and communicated by the Incident Commander – incident command generally evaluates the need for resources and gives commands to move those resources around; but, if circumstances change rapidly and necessity arises, RRT Squads can take action to stop criminal behavior.

On November 17, 2011, Sgt. McDaniel acted as assistant squad leader for RRT Bravo Squad. Bravo Squad leader Roeser went to the incident briefing prior to the days events, and assistant squad leader McDaniel was responsible to get the team together and make sure the team members had all their appropriate gear, that the gear was in good working order, making sure which team members were present. Then Sgt. Roeser briefed the team based on the incident briefing Roeser attended, after which McDaniel worked with Roeser to direct Bravo Squad members throughout the work day.

On November 17, 2011, Sgt. McDaniel was carrying a medium sized can of pepper spray, the next size bigger than the small, 1-2 oz. containers carried by patrol officers on their duty belts or external vest. The container Sgt. McDaniel carried is called a "Mark 9," holding something in the range of 10-12 ounces. On November 17, 2011, Sgt. McDaniel carried a pepper spray product made by a manufacturer called "Defense Technologies." Currently, PPB Officers carry a product made by a manufacturer called "Red Sabre," which is about 5 times

Page 32 –  DEFENDANTS' AMENDED WITNESS LIST

hotter than the "Defense Technologies" product Sgt. McDaniel carried on November 17, 2011.
The Defense Technologies spray was rated at 500,000 Scoville Heat Units; the Red Sabre spray
is rated at 2.5 million Scoville Heat Units, according to the labels.

Sgt. McDaniel has been trained in the use of pepper spray. While at Seaside Police
Department, reserve officers were sprayed with a pepper spray product called "Punch 4," rated at
2.5 million Scoville units. The officers were sprayed in the face, and then had to put handcuffs
on a subject who fought for approximately 10-15 seconds, and then went limp. The Oregon
Department of Public Safety Standards and Training Police Academy basic curriculum included
basic pepper spray training, where Sgt. McDaniel learned that an officer should aim for the
subject's face area, but should not be too close to the subject because the spray atomizes quickly.
Pepper spray is an irritant that causes a burning sensation in the eyes, nose and skin. When
inhaled, it gives the subject brief difficulty breathing. In Sgt. McDaniel's experience, that effect
clears quickly. The spray causes the subject to produce tears and mucus in large amounts. The
spray causes the subject's eyes to close, but not to swell. November 17, 2011, was the first time
Sgt. McDaniel used pepper spray outside of a training context, and Plaintiff was the second
person Sgt. McDaniel had ever used pepper spray on outside of a training context.

Sgt. McDaniel's understanding of "passive resistance" in the RRT context is most
commonly people who are simply sitting in a given place, not moving. In a crowd-control
context, "passive resistance" includes people who are standing, allowing themselves to be
pushed by RRT officers using batons in the port-arms position, moving no father than they are
physically moved by the RRT Officer, but not returning to the RRT skirmish line. Those
subjects may be talking to or yelling at the Officers, but no more than that.

"Passive resistance" changes to "physical resistance" when persons who are pushed by
RRT officers using batons in the port-arms position actively return to the RRT skirmish line, and
use their weight against the officers' pushes. That "physical resistance" becomes "aggressive

Page 33 –   DEFENDANTS' AMENDED WITNESS LIST

physical resistance" when the person begins to reach for or take swings at the officers. RRT training advises pushing with the long batons in the port-arms position, meaning the baton flat to the body at a 45-degree angle. As subjects in a crowd become more aggressive, officers can change the baton to an on-guard position, with the baton pointed forward so the end of the baton is pointing towards the crowd or the targeted individual. If the subject engages the officer, the officer thrusts the end of the baton toward the subject's midsection.

In Sgt. McDaniel's position behind the RRT skirmish line, where RRT Officers are handling their batons with both hands, he is aware that aggressive physical resistance by subjects in the crowd is likely to lead to use of the officers' batons in the on-guard position. On-guard use of the baton is more likely to result in injury than pepper spray, the effects of which dissipate within approximately 30 minutes. In Sgt. McDaniel's opinion, the on-guard use of the baton is a higher level of force than pepper spray.

In Sgt. McDaniel's observation, Plaintiff was more or less passive as she was pushed to the east along the south sidewalk of SW Yamhill Street. As RRT Bravo Squad came to its stopping place for moving the crowd, and the corner of SW 6th Avenue and SW Yamhill Street, and stopped, Plaintiff became more aggressive – instead of just staying back with the rest of the crowd, Plaintiff advanced back toward the skirmish line. Sgt. McDaniel saw Plaintiff get pushed multiple times, then as she regained her footing, Sgt. McDaniel observed Plaintiff lean forward as if she were coming straight back to the line. Sgt. McDaniel thought that if Plaintiff got back to the skirmish line, she was likely to be on the receiving end of an on-guard jab with a baton from one of the Bravo Squad Officers. Sgt. McDaniel was not carrying a long baton like the ones carried by the Officers on the skirmish line. Sgt. McDaniel reasoned that pepper spray's effects would last approximately 30 minutes, and present less possibility of injury to Plaintiff. In Sgt. McDaniel's observation, Plaintiff was engaged in physical resistance, which is the level of resistance identified by PPB Directive 1040.00 "Aerosol Restraints" as necessary before an

Page 34 –   DEFENDANTS' AMENDED WITNESS LIST

officer uses pepper spray on an individual subject. Sgt. McDaniel observed Plaintiff to then engage in aggressive physical resistance, in which case other impact weapons are authorized by PPB policy, and therefore believed that pepper spray was a lesser use of force than authorized under the governing PPB Directive 1010.00 "Use of Force."

Plaintiff was in SW Yamhill Street. There were PPB Officers inside Chase Bank attempting to arrest trespassers and take those arrestees out of the bank. That was the reason RRT was deployed along the south sidewalk of SW Yamhill Street between SW Broadway and SW 6th Avenue in Sgt. McDaniel's understanding. RRT's mission was to create a bubble to keep demonstrators outside from the doors to Chase Bank on SW Yamhill Street. Plaintiff had moved from SW Yamhill Street onto the south sidewalk, but the crowd had to be moved east on the sidewalk away from the bank doors on SW Yamhill Street. MFF squads were behind the RRT skirmish lines to assist with bringing arrestees out of the bank. RRT's assignment was to protect the arrest team and arrestees in coming out of the bank doors on SW Yamhill Street. Eventually, it was decided that the space created on the sidewalk by RRT squads was insufficient for that purpose, and RRT was directed to move the crowd to give more room. That decision was made above Sgt. McDaniel's level of authority.

The PPB Sound Truck was broadcasting commands to clear the street, but Sgt. McDaniel was not aware of the specific commands being given. RRT Officers were saying, repeatedly, "get back," "move back," and directions of that nature. RRT Officers are trained to tell people in the crowd to move back, rather than to just begin pushing people with batons. It is not, and was not on November 17, 2011, feasible for RRT Officers to explain to people in the crowd specifically what areas were being closed, and why, and that if they did not move they could be subject to chemical agents or impact weapons.

Sgt. McDaniel was aware that demonstrators were shouting, but not specifically what they were shouting. Sgt. McDaniel did not have the impression that the people in the crowd on

Page 35 –  DEFENDANTS' AMENDED WITNESS LIST

the sidewalk were confused about the fact that RRT Officers intended for them to move to the east across SW 6th Avenue or north to Pioneer Courthouse Square, because those instructions were being repeated by Officers and the RRT skirmish line was moving people in that direction. Sgt. McDaniel observed that there was open sidewalk for people to move to, and sufficient space for people to move there.

Sgt. McDaniel's role as Bravo Squad assistant squad leader was to supervise Bravo Squad RRT Officers on the skirmish line, address gaps in the skirmish line, communicating with Bravo Squad leader Sgt. Roeser and other squad Sergeants about the mission as it developed, and to address any subjects that were to be taken into custody outside the bank. RRT Officers on the skirmish line may or may not carry pepper spray, but have both hands on their batons, thus Sgt. McDaniel also had responsibility for using pepper spray or any other tool or weapon that the skirmish line officers could not access or use due to their presence on the skirmish line with a baton. Sgt. McDaniel's purpose in using any such weapon or tool was to protect Bravo Squad RRT Officers and members of the crowd from each other based on the conduct Sgt. McDaniel observed.

Application of pepper spray to an individual subject based on the conduct of that individual subject is governed by PPB Directive 1040.00 "Aerosol Restraints," which governs all PPB Officers in the patrol context. PPB Officers are authorized to use pepper spray on an individual subject when the conduct of the subject and the totality of the surrounding circumstances meet the criteria of the directive. Sgt. McDaniel specifically targeted Plaintiff individually for his use of pepper spray based on Plaintiff's individual conduct and the totality of the surrounding circumstances. Sgt. McDaniel did not use pepper spray on November 17, 2011 in order to move the crowd back.

In Sgt. McDaniel's understanding, PPB Officers are expected to use the appropriate level of force necessary to safely resolve a given situation. That may not always be the least or lowest

Page 36 –  DEFENDANTS' AMENDED WITNESS LIST

level of force, because the determination of the "least" or "lowest" level of force is open to interpretation. For example, one person may say a taser is the least amount of force, where another person may say a physical strike is the least amount of force, where either might be an appropriate technique for resolving a situation safely and effectively. Warnings before using force are a good idea where there's enough time and such a warning is feasible, but those conditions do not always exist.

On November 17, 2011, PPB's RRT Bravo Squad was instructed to move northbound on SW 6th Avenue and stop short of SW Yamhill Street. When Bravo Squad arrived, there were MFF units and another RRT squad already present. The two RRT squads were instructed that they would move to the sidewalk on the south side of SW Yamhill, west of SW 6th Avenue; the other RRT squad against the building, Bravo Squad along the curb. Mounted Patrol Units (horses) would be there also. The RRT squads were expected to keep people off the sidewalk while MFF squads dealt with arrestees inside the bank. The two RRT squads moved into those positions. It was in that formation that Sgt. McDaniel filled a gap in the line of RRT Officers until sufficient officers were in formation to allow him to resume his assistant squad leader position behind the RRT Officer line. It appeared obvious to Sgt. McDaniel that there was insufficient space on the sidewalk for the MFF Officers to operate, and that message was passed up the chain of command. A short time later, the RRT squads were instructed to move further along the sidewalk to the east, in order to give the MFF Officers more room to work.

The RRT squads moved people on the south sidewalk along SW Yamhill Street using a technique called "route step," which is a slow movement where the crowd is instructed to move back and pushed with batons. In that movement, if people in the crowd become aggressive with RRT officers, the officers can use batons in an on-guard position.

In Sgt. McDaniel's observation, the majority of the crowd on the south sidewalk of SW Yamhill Street were merely yelling and chanting as would be expected in a protest

Page 37 – DEFENDANTS' AMENDED WITNESS LIST

demonstration. Only a few were being outwardly aggressive with Officers. Plaintiff became one of those people immediately before Sgt. McDaniel pepper-sprayed plaintiff. In Sgt. McDaniel's opinion, after he had seen Plaintiff pushed multiple times, the RRT skirmish line stopped at the corner of the bank building, and the crowd stayed back for the most part. Plaintiff came up to the RRT skirmish line multiple times and appeared to be the most aggressive among the people in the crowd around her that Sgt. McDaniel could see; Sgt. McDaniel knew that, based on RRT training, Plaintiff was likely to be subjected to an on-guard jab with a baton by an RRT Officer.

Sgt. McDaniel estimates that he was approximately 6 to 8 feet from Plaintiff when he directed a short burst of pepper spray at Plaintiff. Sgt. McDaniel did not consider the possibility that Plaintiff might stop before reaching Officer Paisley because Plaintiff had not stopped before reaching Officer Paisley before.

At approximately 8:20 to 9:08 in PPB video GoPro 0074, Sgt. McDaniel observes that Plaintiff pulls her bandana down off of her face and comes back toward the RRT skirmish line. Plaintiff is pushed back again. Plaintiff regains her footing and starts moving forward again and goes off the screen to the right. Then the pepper spray can be seen. Sgt. McDaniel lost sight of Plaintiff after she was sprayed, turned her back to the officers, and sat down on the pavement. Sgt. McDaniel does not recall seeing Plaintiff pulled through the RRT skirmish line.

At approximately 9:30 and 10:07 of PPB video GoPro 0130, Sgt. McDaniel can see Plaintiff exerting some force against an officer by leaning into the officer as the officer attempts to move her. Between 10:07 and 11:33, Sgt. McDaniel observes a man with this hand on Plaintiff's shoulder, attempting to hold her back as she moves toward the police line.

Sgt. McDaniel will testify to any other matter put at issue by plaintiff.

**13.    Dr. Eowyn Rieke, M.D.**  15 minutes for direct testimony.

Dr. Rieke will authenticate her chart notes related to her interactions with Plaintiff Nichols on November 13, 2011; to the effect that Plaintiff reported not feeling depressed;

Page 38 – DEFENDANTS' AMENDED WITNESS LIST

December 11, 2011 to the effect that plaintiff reported not feeling depressed, showing symptoms of eczema; January 1, 2012 to the effect that plaintiff reported feeling depressed, but did not want medication for depression, had support from friends, did not want additional support or counseling, and was "mostly here for documentation of depression for legal reasons;" January 29, 2012 to the effect that plaintiff reported "has been depressed for the last few months," "has not been having nightmares, no flashbacks or reliving of traumatic experience, no hyper alertness, exaggerated startle reflex or hyper vigilance," "is really tired of talking about Occupy," "has applied for school at PSU, trying to find a job," Skin has been stable, no worse than her pre-pepper spray baseline. Using hydrocortisone with good effect. Gets red, itchy scaling skin on her hands," "She declines counseling and medications at this time, says she has support and resources in the community;" February 12, 2012 to the effect that plaintiff was not feeling depressed;" March 25, 2012 to the effect that plaintiff "has been feeling more cheerful, less depressed recently. In relationship and that has been helping," "Eczema continues to be a problem, HC 2.5% is helping a lot," "got accepted to PSU, starting next week;" April 29, 2012 to the effect that plaintiff's chief complaints were "eczema, depression," "patient not currently suicidal, declines meds, will pursue counseling at PSU;" June 24, 2012 to the effect that plaintiff was not depressed.

Dr. Rieke will testify to any other matter put at issue by plaintiff.

**14.    Elizabeth Nichols.** Plaintiff. One (1) hour for direct testimony.

Ms. Nichols saw Dr. Rieke at the Outside In clinic on November 13, 2011 and reported a long history of eczema with itchy, peeling skin on her hands in cold weather. Ms. Nichols had experienced eczema symptoms since birth. Ms. Nichols saw Dr. Rieke on December 11, 2011 and reported that she was not experiencing symptoms of depression. Ms. Nichols further reported dry, scaling skin on her upper arms, chin and neck, which appeared a few days after being sprayed with pepper spray, and that those symptoms were beginning to fade. Ms. Nichols

Page 39 –   DEFENDANTS' AMENDED WITNESS LIST

saw Dr. Rieke on January 1, 2012 and reported feeling stress related to having been pepper sprayed, nightmares, no flashbacks, no suicidal thoughts. Ms. Nichols cannot recall anything in particular about why she felt hopeless, and is not sure her feelings of hopelessness were related to having been pepper sprayed. Ms. Nichols told Dr. Rieke that Ms. Nichols did not ever want medication for depression. Ms. Nichols believes her depression "could have been about anything," and that in the past had experienced feelings of depression once or twice per year in the past. Ms. Nichols agrees with Dr. Rieke's notes from January 1, 2012, that Ms. Nichols' eczema symptoms were much improved from her prior visit. Ms. Nichols saw Dr. Rieke on January 29, 2012 and reported feeling depression for the "last few months." Ms. Nichols describes the feelings as not wanting to talk to anyone or do anything, and crying more frequently. Ms. Nichols had applied to Portland State University, but had not worked at a job since the summer of 2009. Ms. Nichols reported to Dr. Rieke no nightmares, no flashbacks or reliving of traumatic experiences, no hyper alertness, no exaggerated startle reflex of hyper vigilance.

On January 29, 2012, Ms. Nichols reported to Dr. Rieke that Nichols was "really tired of talking about Occupy." Ms. Nichols meant that people she knew and people she did not know asked her about the photo of herself being pepper-sprayed on November 17, 2011, including media representatives through email. Ms. Nichols had become less involved with Occupy and did not want to "bother with it anymore." Ms. Nichols lost interest in Occupy because it was not moving toward goals she thought it had at the beginning, and because she had other things in life to occupy her mind. Ms. Nichols saw Dr. Rieke on February 12, 2012 and reported she had no depression symptoms. Ms. Nichols saw Dr. Rieke on March 25, 2012 and reported feeling more cheerful and less depressed, and that a current long-distance relationship was helping her mood and sense of well-being. Ms. Nichols is no longer in that relationship, and her partner "left me on January 4, 2013." Ms. Nichols saw Dr. Rieke on April 29, 2012 and reported feeling more

Page 40 – DEFENDANTS' AMENDED WITNESS LIST

emotionally unstable, that she intended to obtain counseling from PSU, and did not want medication. Ms. Nichols believes that her depression symptoms on April 29, 2012 were related to her beginning as a student at PSU in April 2012, which Ms. Nichols found slightly overwhelming because of increased tasks and responsibility and making new friends. Ms. Nichols looked into counseling at PSU, but did not pursue it once she found that PSU did not provide long-term counseling. Ms. Nichols never sought counseling outside of PSU after that. Ms. Nichols saw Dr. Rieke on June 24, 2012 and reported experiencing no depression symptoms. Ms. Nichols did not see any provider of healthcare services for any injury alleged in her lawsuit against Defendants City of Portland, Jeffrey McDaniel and/or Doris Paisley after June 24, 2012. Ms. Nichols did not have to pay for any healthcare services by any healthcare provider for any injury or condition for which she is suing the City of Portland, Jeffrey McDaniel and/or Doris Paisley in this case. Ms. Nichols was never diagnosed with "post traumatic stress disorder" by any healthcare provider.

On November 17, 2011, Ms. Nichols entered the ATM lobby of the Chase Bank through the doors on SW Yamhill Street and remained there for approximately 30 minutes. Ms. Nichols was escorted out of the lobby by PPB Officers. Ms. Nichols was passed from one officer to another until "they made me go across the street and then I saw a friend of mine back on the side of the street I was on before, and so I went back and talked to him." Ms. Nichols was not hurt in any way by the PPB Officers.

Ms. Nichols can identify herself in PPB video Go Pro 074 at 02:47. Ms. Nichols is standing in the middle of SW Yamhill Street, looking for her computer, which she had handed off to someone when she went into the Chase ATM lobby. Ms. Nichols had room to walk north across SW Yamhill Street to Pioneer Courthouse Square.

In PPB video Go Pro 074 at 03:53, Ms. Nichols could hear an announcement from the PPB sound truck that Ms. Nichols believed meant to get on the sidewalk and get out of the street

Page 41 –   DEFENDANTS' AMENDED WITNESS LIST

so that Ms. Nichols would not get run over. Ms. Nichols believed she had a responsibility to get out of the street at that time.

In PPB video Go Pro 074 at 04:20, Ms. Nichols did not know why the people around her walked from the south to the north side of SW Yamhill Street, and had not heard any instruction to do so. Ms. Nichols walked from west to east down the middle of SW Yamhill Street following a friend further down to another crowd of people on the south side of SW Yamhill Street because PPB Officers would not let her on the south sidewalk where she had been before. Ms. Nichols knew that if she moved far enough east on SW Yamhill Street, she would not have to have further contact with police officers, which contact she did not want to have. Ms. Nichols knew what police officers were doing in the Chase ATM lobby, that they were arresting people, and that they would have to take the people out of the ATM lobby. Ms. Nichols was aware that police were trying to keep the ATM lobby doors on SW Yamhill Street clear because they were going to take people arrested in the bank out through those doors. Ms. Nichols "didn't see why they needed to" move people down the sidewalk away from the bank doors. Ms. Nichols believed the police "had more than enough room," and believed there were too many people behind her for Ms. Nichols to move east on the sidewalk. Ms. Nichols was aware of the crosswalk and traffic control signals at the intersection of SW 6th Ave. and SW Yamhill Street. Ms. Nichols can't recall why she couldn't just walk to the crosswalk and go east or north, "I just wasn't paying attention."

When police began to push people east on the south sidewalk of SW Yamhill Street, Ms. Nichols was not confused about where the police wanted the crowd to move; Ms. Nichols was only confused as to why. The only reason Ms. Nichols didn't move was because the crowd of people behind her stopped her. Had the police asked Ms. Nichols to go across the street, she would have done it. "But when you're trying to move an entire crowd, I guess you have to push."

Page 42 —  DEFENDANTS' AMENDED WITNESS LIST

In PPB video Go Pro 074 at 04:43, Ms. Nichols admits seeing police officers gesturing north to Pioneer Courthouse Square and saying "over there, over there," but did not hear that at the time.

In PPB video Go Pro 074 at 06:56, Ms. Nichols is standing in a parking space on the south side of SW Yamhill Street. Police officers in the street blocked Ms. Nichols from crossing the street. Ms. Nichols had had ample opportunity before standing there to go across to Pioneer Courthouse Square.

In PPB video Go Pro 074 at 07:50, a police officer explained to Ms. Nichols that the parking space was part of the street and that she and the others were not supposed to be there. Then police began moving people to the east on SW Yamhill.

In PPB video Go Pro 078 at 08:39, Ms. Nichols is standing near the parking space, but further out in SW Yamhill Street, even though Ms. Nichols was aware of police instructions to get out of the street. Ms. Nichols was aware of the line of police officers along the south curb of SW Yamhill Street, and that Ms. Nichols was not going to be able to get on the south sidewalk of SW Yamhill Street from where she was standing.

In PPB video Go Pro 078 at 09:19, Ms. Nichols was present when police officers gestured to the north side of SW Yamhill Street, but did not see it because Ms. Nichols faced north.

In PPB video Go Pro 078 at 11:13, Ms. Nichols interacts with a police officer. Ms. Nichols asked if she could go west on SW Yamhill to look for her computer. The Officer told Ms. Nichols that she would have to go around the block to the east.

In PPB video Go Pro 078 at 11:21, police began pushing the crowd to the east on the south sidewalk of SW Yamhill Street. It was not unclear to Ms. Nichols where police intended for the people to go, it was confusing why.

Page 43 – DEFENDANTS' AMENDED WITNESS LIST

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
(503) 823-4047

In PPB video Go Pro 074 at 08:11, Ms. Nichols can see two people immediately near her go across SW Yamhill Street to the north, and a man on the sidewalk pointing to the north.

In PPB video Go Pro 074 at 08:22, Ms. Nichols has her back against a large metal box on the south sidewalk of SW Yamhill Street. Ms. Nichols had moved significantly to the east of where she stood when officers started moving the crowd to the east, a period of 32 seconds. Ms. Nichols had room to move there, and nothing prevented Ms. Nichols from going there. When Ms. Nichols stood against the metal box, she wanted police to stop pushing people or explain to go elsewhere. Based on the fact that police were pushing people to the east, Ms. Nichols was aware that police intended for people on the sidewalk to move to the east.

In PPB video Go Pro 130 at 11:00, Ms. Nichols was pushed off of the metal box by an Officer in helmet B11 using his shoulder, and Ms. Nichols moved east away from the box.

In PPB video Go Pro 130 at 11:10, Ms. Nichols can see people crossing SW Yamhill Street to the north using the crosswalk.

In PPB video Go Pro 074 at 08:56, Ms. Nichols had locked arms with the woman next to Ms. Nichols, which prevented Ms. Nichols from crossing SW Yamhill Street to the north in the crosswalk to Pioneer Courthouse Square. Ms. Nichols locked arms with the woman because "I just didn't want anybody else to get hurt because I could see them jabbing people in the ribs." Ms. Nichols did not link arms with the woman next to her in order to avoid moving.

In PPB video Go Pro 074 between 08:50 and 08:58, Ms. Nichols was pushed twice by Officer Paisley using Officer Paisley's baton in the horizontal position. After that, Ms. Nichols approached Officer Paisley with Ms. Nichols' hand in the air. Immediately before being pepper-sprayed, Ms. Nichols reached toward Officer Paisley's baton to move it from Ms. Nichols' neck. Ms. Nichols appears to reach for Officer Paisley's baton.

In PPB video Go Pro 130 between 11:26 and 11:30, Ms. Nichols can see Officer Paisley in helmet B9, Officer Paisley's baton go under Ms. Nichols' chin, Officer Paisley's baton come

Page 44 – DEFENDANTS' AMENDED WITNESS LIST

away from Ms. Nichol's head, Ms. Nichols facing Officer Paisley directly, but Ms. Nichols testified that Ms. Nichols was not trying to approach Officer Paisley.

After Ms. Nichols was sprayed with pepper spray, she turned until her back was to the officers, and sat down on the pavement. Ms. Nichols was pulled behind the police line and taken into the Chase lobby. Her hands were cuffed with a plastic zip tie, and a PPB Officer took Ms. Nichols outside and washed her face and eyes with water. Ms. Nichols can't recall whether she was told that she was under arrest because Ms. Nichols was yelling. Ms. Nichols understood that she was under arrest. Ms. Nichols was tried and convicted for failing to obey a police officer, based on her actions depicted in PPB video Go Pro 074, PPB video Go Pro 078 and PPB video Go Pro 130.

Dated:  August 1, 2013.

Respectfully submitted,

DAVID LANDRUM, OSB # 955425
Senior Deputy City Attorney
Telephone: (503) 823-4047
Of Attorneys for Defendants

Page 45 –  DEFENDANTS' AMENDED WITNESS LIST